MONON CORPORATION and Rosby
Corporation, Plaintiffs–Cross
Appellants,

v.

STOUGHTON TRAILERS, INC.,
Defendant–Appellant.

Nos. 00–1041, 00–1042.

United States Court of Appeals,
Federal Circuit.

Feb. 7, 2001.

Lee F. Grossman, Grossman & Grossman, of Chicago, IL, argued for plaintiff-cross-appellant. With him on the brief was Mark M. Grossman.

Jonathan H. Margolies, Michael, Best & Friedrich LLP, of Milwaukee, WI, argued for defendant-appellant.

Before MICHEL, RADER, and SCHALL, Circuit Judges.

MICHEL, Circuit Judge.

This appeal requires our determination of whether a patentee submitted sufficient evidence to preclude the grant of summary judgment of invalidity due to the on-sale bar. Oral argument was heard on October 3, 2000. Because we find that the patentee raised a genuine issue of material fact as to whether its sale of a tractor truck trailer prior to the critical date of its patent was primarily experimental, and thus was not a "commercial sale" for the purposes of 35 U.S.C. § 102(b), we reverse the trial court's grant of summary judgment and remand for further proceedings on validity and infringement consistent with this opinion. However, we affirm the trial court's judgment, following a bench trial, that the patentee did not engage in inequitable conduct before the PTO, because the judgment is based on a finding of lack of deceptive intent that is not clearly erroneous.

## HISTORY OF THE CASE

On January 26, 1995, Monon Corporation and Rosby Corporation (collectively "Monon") filed suit against Stoughton Trailers, Inc. ("Stoughton") in the United States District Court for the Northern District of Illinois for infringement of

their U.S. Patent No. 4,904,017 ("the '017 patent") for making and selling the patented trailer. Stoughton counterclaimed for declaratory judgments of invalidity, noninfringement, and unenforceability due to alleged inequitable conduct during the prosecution of the application that issued as the '017 patent.

Following discovery, the district court issued a memorandum opinion and order granting Stoughton summary declaratory judgment of invalidity. The court held that claims 1 through 4 of the '017 patent were invalid because, in violation of 35 U.S.C. § 102(b), Monon had sold a trailer embodying the claimed invention more than one year prior to February 26, 1985, the date on which Monon filed the patent application. *Monon Corp. v. Stoughton Trailers, Inc.,* 915 F.Supp. 13 (N.D.Ill. 1996) ("*Monon I* "). On February 16, 1996, Monon and Stoughton agreed on the record before the district court that the court's February 7, 1996 Order rendered Monon's infringement claim moot. The district court therefore did not adjudicate Monon's infringement claim, either pursuant to Stoughton's summary judgment motion or by trial. On March 7, 1996, the district court denied Monon's motion for reconsideration of the February 7, 1996 Order and also denied Monon's motion for leave to seek interlocutory appeal before this court.

After a bench trial, the district court denied relief on Stoughton's counterclaim for a declaratory judgment of unenforceability for inequitable conduct. *Monon Corp. and Rosby Corp. v. Stoughton Trailers, Inc.,* No. 95–C–511 (N.D.Ill. Sept. 27, 1999) ("*Monon II* "). On September 28, 1999, the district court entered final judgments, in favor of Stoughton on its invalidity counterclaim, and in favor of Monon on Stoughton's unenforceability counterclaim.

Stoughton appeals from the district court's adverse judgment on its unenforce-

ability counterclaim. Monon cross-appeals the summary declaratory judgment of invalidity. Because Stoughton has failed to show that the district court committed clear error in finding that the inventor and his attorney had not acted with deceptive intent, on the appeal we affirm the district court's declaratory judgment of no inequitable conduct. However, because the district court impermissibly resolved genuinely disputed material issues of fact regarding alleged experimental use, on the cross-appeal we reverse the summary judgment of invalidity and remand for further proceedings.

## BACKGROUND OF THE INVENTION

Monon and Stoughton both manufacture large enclosed trailers that are used to contain cargo as it is hauled over roads by large trucks, or "tractors." As disclosed in the '017 patent, the standard practice in the tractor-trailer shipping industry is to load the trailer with freight that has previously been secured upon standard-sized shipping pallets measuring 56″ × 44″. By pre-loading the freight onto pallets, the time required to load the trailer is reduced. When loaded into the trailer, the pallets are arranged in two rows running the length of the trailer. The internal width of prior art trailers was only large enough to accommodate two rows of standard pallets if the pallets were oriented so that their shorter dimension (44″) was parallel to the trailer's width, and their longer dimension (56″) was parallel to the trailer's length. Trailers constructed using the standard prior art design are referred to as "sheet and post" trailers because the structural integrity of the trailer body is provided by 1.5″ thick vertical posts spaced along the sidewalls of the trailer at 24″ intervals. These posts support the weight of the freight, provide support for the roof, and also for the 0.05″ thick aluminum "sheets" that are joined to the posts to form the outer walls of the trailer. The

thickness of the posts intrudes upon, and reduces, the width available for cargo space. As a result, the only way that two standard pallets will fit within the 98.5″ wide cargo area of a standard sheet and post trailer is if they are both oriented with their shorter dimension running the width between the posts.

In 1983, Continental Can, a tractor-trailer transport company, approached several trailer manufacturers, requesting that a trailer be designed and built with a cargo area that had greater width so that one of the two rows of pallets could be loaded with the longer dimension of the pallets aligned with the trailer's width, *i.e.*, with one of the two rows of pallets rotated 90 degrees relative to the standard loading arrangement. By doing so, such a trailer could accommodate 25 standard pallets, whereas prior art trailers were limited to 22. However, the outer width of a trailer cannot be increased due to governmental highway-use regulations, and therefore any increase in internal width had to be gained by reducing the thickness of the trailer's sidewalls or vertical support posts. Of the several trailer manufacturers that Continental approached, only Monon was willing to investigate a design lacking the thick side posts of prior art trailers. The other trailer manufacturers were unwilling to dispense with the thick side posts because they believed that without the support provided by the posts, a loaded trailer would probably "break in half."

Rodney P. Ehrlich, the inventor named on the '017 patent, was Monon's Vice President of Engineering when Continental asked Monon to design and build a trailer with a wider cargo area. In satisfying Continental's request, Ehrlich designed a trailer in which the thick side posts were eliminated, thereby increasing the width available for cargo. Ehrlich accomplished this by using thicker sidewall panels, 0.19″ rather than 0.05″, that are stressed along their entire width to provide support for the cargo and trailer body. These sidewalls of thicker spliced aluminum panels connect the trailer's roof to its undercarriage, provide the trailer's structural support, and eliminate the need for the thick posts of prior art designs. Ehrlich referred to this design as the "plate trailer" because its sidewalls are comprised of aluminum panels, approximately 0.19″ thick, connected by splice plates, also approximately 0.19″ thick. Thus, the sidewalls of Ehrlich's plate trailer are approximately 0.38″ thick, while the sidewalls of a prior art sheet and post trailer are approximately 1.55″ thick, including the posts. Ehrlich's design increased the interior width available for cargo to more than 101″, sufficient to accommodate the wider dimension of one pallet, 56″, plus the narrower dimension of the other of each side-by-side pair, 44″. Continental's Douglas Werner, who was designated as a witness by Stoughton, acknowledged that Ehrlich's design was a "radical departure" from sheet and post trailers.

On December 19, 1983, Continental contracted with Monon to purchase one plate trailer for $18,490.00, with the intention of purchasing an additional 300 once the trailer's durability had been proven in actual, normal use in Continental's fleet of tractor-trailers. Monon constructed the first trailer in January and February of 1984. This sample trailer was delivered to Continental in April 1984, at a final price of $18,640.00. In December 1984, after the strength and durability of the plate trailer had been successfully proven, Continental ordered 300 plate trailers. Later, in February 1985, Monon received the first trailer back from Continental for inspection.

On February 26, 1985, the patent application that issued as the '017 patent was filed.

In 1985, Ehrlich and several other Monon employees left Monon in order to form Wabash National, a trailer manufacturer

that has been competing directly with Monon since its inception. Wabash is not a party to this suit.

## ANALYSIS

### I. The On–Sale/Public Use Statutory Bar

#### A. *Summary Judgment*

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, summary judgment is proper only when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In determining whether there is a genuine issue of material fact, the trial court must assume that the evidence presented by the non-movant is credible and draw all justifiable inferences therefrom in the non-movant's favor. *Id.* at 255, 106 S.Ct. at 2513. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. at 2510. We review a grant of summary judgment *de novo*. *Johns Hopkins Univ. v. Cellpro, Inc.*, 152 F.3d 1342, 1353, 47 USPQ2d 1705, 1713 (Fed.Cir.1998).

#### B. *The On Sale Bar*

A patent is presumed to be valid. 35 U.S.C. § 282. A patent is invalid if the patented device was publicly used or on-sale in the United States more than one year before the date on which the patent application was filed. *See* 35 U.S.C. § 102(b) ("A person shall be entitled to a patent unless ... the invention was ... in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."). We give the term "critical date" to the date one year prior to the date on which the patent application was filed.

The ultimate determination of whether a patent is invalid under § 102(b) due to application of an on-sale bar is a question of law. *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 182 F.3d 888, 889, 51 USPQ2d 1470, 1471 (Fed.Cir.1999) ("The ultimate determination of whether an invention was on sale within the meaning of § 102(b) is a question of law."). This ultimate determination is "based upon underlying factual considerations." *Weatherchem Corp. v. J.L. Clark, Inc.*, 163 F.3d 1326, 1332, 49 USPQ2d 1001, 1006 (Fed.Cir.1998). In order to overcome the presumption of validity, such underlying facts supporting a determination of invalidity must be proven by clear and convincing evidence. *Sonoscan, Inc. v. Sonotek, Inc.*, 936 F.2d 1261, 1263, 19 USPQ2d 1156, 1158 (Fed.Cir.1991) ("The facts concerning an 'on sale' defense must be proved by clear and convincing evidence.").

The Supreme Court has held that in order for a patent to be held invalid under the on-sale bar of § 102(b), two conditions must have been met prior to the critical date: "First, the product must be the subject of a commercial [sale or] offer for sale.... Second, the invention must be ready for patenting." *Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55, 67, 119 S.Ct. 304, 311–12, 142 L.Ed.2d 261 (1998). In the instant appeal, the district court granted summary judgment of invalidity due to an on-sale bar. Whether satisfaction of the two conditions of this test were issues of fact or questions of law the Supreme Court did not state, nor need we do so today. Beyond question, the facts underlying each of the two conditions are issues of fact. Accordingly, we must reverse the judgment if we conclude that Monon raised a

genuine issue of fact material to the determination of whether either of *Pfaff's* two conditions was met.

■ A showing that a patentee has publicly used or sold its device prior to the critical date does not necessarily trigger the on-sale bar. Rather, evidence that the public use or sale of the patented device was primarily experimental may negate an assertion of invalidity. *See id.* (affirming judgment of invalidity where "there is no question that the [pre-critical date] sale was commercial rather than experimental in character"); *Elizabeth v. American Nicholson Pavement Co.,* 97 U.S. (7 Otto) 126, 137, 24 L.Ed. 1000 (1877) ("Any attempt to use [a claimed invention] for a profit, *and not by way of experiment,* for a longer period than two years [later reduced to one year] before the application, would deprive the inventor of his right to a patent.") (emphasis added); *Zacharin v. United States,* 213 F.3d 1366, 1370, 55 USPQ2d 1047, 1050 (Fed.Cir.2000) (suggesting that judgment of invalidity may have been unsupported had the purpose of the pre-critical date sales contract been for "testing of the [claimed invention's] design"); *TP Laboratories, Inc. v. Professional Positioners,* 724 F.2d 965, 971, 220 USPQ 577, 582 (Fed.Cir.1984) (stating that, in *Elizabeth,* "the Court reasoned that, if a use is experimental, even though not secret, 'public use' is negated").

Consistent with this approach, we first determine whether Monon has raised a genuine issue of fact material to the determination of whether its admitted December 19, 1983 sale of the first plate trailer to Continental was primarily experimental.

### C. *Was the Sale to Continental for Experimental Purposes?*

■ It is undisputed that on December 19, 1983, Continental contracted with Monon to purchase one trailer for approximately $18,500, that Monon constructed this trailer in January and February 1984, and that Monon delivered the trailer to Continental in April 1984. Moreover, it appears to be undisputed that Monon sought to sell additional trailers to Continental after Continental had used the first trailer. Monon filed its patent application on February 26, 1985, such that the critical date of the patent is February 26, 1984.

According to Stoughton, the December 19, 1983 contract between Monon and Continental constitutes a commercial sale prior to the critical date. The trial court agreed, and invalidated the patent claims on summary judgment. The court explained:

> When Continental took possession of the plate trailer, it had complete control over its use. It paid $18,640 for the product and placed [it] in its regular fleet. Furthermore, Monon's argument that there was a twelve-month test of the product is unavailing. The inventor himself testified that he never saw the trailer during the time Continental had it and that no one at Monon was instructed or otherwise assigned to monitor it. From this and other testimony, it is clear to the court that the sale of this product to Continental was done simply to induce another much larger sale.

*Monon I,* 915 F.Supp. at 18. The question on appeal is whether Monon raised a genuine issue of material fact at the trial court to suggest that the December 19, 1983 contract did not constitute a "commercial offer for sale." *Pfaff,* 525 U.S. at 67, 119 S.Ct. at 311.

#### 1. *Testing Conditions*

We note that Monon was only a trailer manufacturer, and that it did not routinely operate its trailers. To test its trailers, and determine if they were suitable for sale to the public, the evidence indicates that Monon sought to subject its trailer to conditions of actual use. For example,

Ehrlich testified in his deposition that he sought to provide Continental with a trailer for a test period to determine if the trailer was sufficiently durable to withstand the stress of heavy loading and long hauls. Ehrlich stated:

> I told Continental Can to use the trailer in any and every and the most stringent hauls that they could put it in, because we wanted to learn about the trailer.... I knew that Continental Can's normal loading operation consisted of light loading as well as heavy loading, so I wanted them to subject it to all of their conditions that the trailer would normally be subjected to, not just the light load conditions. So I wanted them to use it in the general way that they would use it. It was to be a test period. If there were any weaknesses, we wanted to find out in that time.... That's the best way I knew how to evaluate it.

Moreover, Monon points to the testimony of Stoughton's chief engineer, who acknowledged that had Stoughton itself built the first plate trailer, "it [would have been] necessary to test it in its real working environment to make sure that it would work." This evidence suggests that it may have been necessary for Monon to secure the cooperation of a company such as Continental that would subject the trailer to conditions of actual use, and determine if the sidewalls of the trailer were sufficiently strong. Accordingly, it is plausible that the December 19, 1983 contract between Monon and Continental may have been simply an arrangement to permit Monon to meaningfully test the durability of its trailer.

## 2. Control over Experimentation

Stoughton argues that Continental's use of the trailer cannot be deemed to be "experimental use," because Monon did not exercise control over how Continental used the trailer. Stoughton notes, as did the district court, that in a 1995 deposition,

Ehrlich testified that he never inspected, nor even viewed, the trailer during its use by Continental, and that he did not inspect the trailer until after Continental returned the trailer to Monon in February 1985.

Monon contests Stoughton's assertion that Ehrlich never inspected the trailer during its use by Continental. Monon argues that Ehrlich is hostile to Monon because he left Monon to found Wabash National, a direct competitor of Monon. Monon notes that Ehrlich had left Monon in 1985, ten years prior to the deposition cited by Stoughton. Monon also points to testimony by Douglas Werner, who stated that Ehrlich regularly solicited information from Continental's dispatchers about the trailer's whereabouts and performance during Continental's use of the trailer. Werner also testified that he and Ehrlich together inspected the test plate trailer on several occasions during Continental's testing by use to assess its performance. Werner testified that during these inspections, Ehrlich did "a lot of note taking and things like that," and that he and Ehrlich discussed the trailer's performance and possible design changes that they thought might be necessary. Werner also testified that Ehrlich had, on other occasions, inspected the trailer without Werner, and that Ehrlich and other Monon employees made numerous telephone inquiries to Continental, requesting updates on the trailer's performance.

Monon asserts that Werner's testimony directly contradicts the 1995 deposition testimony by Ehrlich relied on by Stoughton. Monon argues that a jury would likely credit Werner's testimony because, unlike Ehrlich, Werner is a third-party witness with no apparent interest in the outcome of this litigation.

The trial court appears to have credited the 1995 deposition testimony of Ehrlich presented by Stoughton, without account-

ing for Werner's conflicting testimony. As noted above, the trial court wrote:

> The inventor himself testified that he never saw the trailer during the time Continental had it and that no one at Monon was instructed or otherwise assigned to monitor it. From this and other testimony, it is clear to the court that the sale of this product to Continental was done simply to induce another much larger sale.

*Monon I*, 915 F.Supp. at 18. It appears from this statement that the court resolved disputed facts against Monon, and may have made credibility determinations in favor of Stoughton. Because the on-sale bar issue was resolved at the summary judgment stage, the trial court was obliged to view the evidence in the light most favorable to the non-movant, Monon. The trial court appears to have erred in failing to do so.

In any event, Monon contends that Ehrlich deliberately distanced himself from Continental's testing of the trailer. Monon points out that Ehrlich testified that he did not want the testing to deviate from conditions of normal use because "[t]hat's the best way I knew how to evaluate it." Rather, Ehrlich wanted the trailer to be subjected to the same conditions of use as all other trailers in Continental's fleet, including heavy loading and use on all types of normally used roadways.

The testimony presented by Monon suggests that Ehrlich and other employees may not have abdicated control over the testing of the trailer, and that, in any case, Monon intentionally sought to exert minimal control over how Continental would use the trailer. Monon asserts that this approach is wholly consistent with its argument that Continental's use of the trailer constituted only "experimental use" and did not trigger the on-sale bar.

### 3. *Continental's Payment to Monon*

It is undisputed that Continental paid Monon for the use of the trailer. Stough-

ton points to this fact as further indication that the contract between Monon and Continental constituted a commercial sale.

■ Whether payment is made for the device is an important factual consideration, but the fact that a company paid for the use of patentee's device is not dispositive. *See Baker Oil Tools, Inc. v.. Geo Vann, Inc.*, 828 F.2d 1558, 1564, 4 USPQ2d 1210, 1214 (Fed.Cir.1987) ("The circumstances of payment, it is well established, are factors to be weighed, but payment does not per se make a section 102(b) bar."). Thus, Continental's payment of $18,640 to Monon for the sample trailer must be considered in determining whether the sale and use were commercial as opposed to primarily experimental. It is undisputed that it was Continental that approached Monon with the request that Monon design and construct a trailer with greater internal width. Monon submitted testimony indicating that Continental was charged only for the cost of building the trailer, and that Monon did not profit from the sale of the test trailer. For example, Monon submitted testimony by Monon's Vice President, William Hoover, and Continental's controller, Peter Dunn, indicating that Monon neither intended to, nor did it, profit from the development and sale of the first trailer.

It is also undisputed that one condition of the sale was that, upon completion of approximately one year of use, Continental would return the trailer to Monon for analysis in exchange for a full credit of the purchase price, if the design was successful. Accordingly, after using the test plate trailer for almost one year, Continental returned it to Monon in February 1985 for analysis, and Monon gave Continental a credit for the trailer's full purchase price.

The district court's opinion mentions the fact that Continental had approached Monon with the request to design a trailer with thinner walls, but it does not mention

the evidence submitted by Monon indicating that Continental agreed to reimburse Monon for constructing the sample plate trailer. *See Monon I*, 915 F.Supp. at 15. The district court described the sale of the first plate trailer as "a marketing play (and good business) by Monon to give Continental use of the product so that down the line Monon could make large profits from a volume sale by Continental." *Id.* at 17.

It may be true that Monon's agreement with Continental was a marketing ploy, and that it helped secure future sales of its trailers. However, the characterization of this sale is very much in dispute. In particular, the district court's opinion does not suggest how the contract can properly be construed as a "commercial sale," when Monon agreed to reimburse Continental for the use of the trailer after the one year trial period. Moreover, it is not surprising that Continental paid Monon for the use of the trailer, as Continental benefited from its use over the course of the year. It appears that a reasonable jury could conclude that, notwithstanding Continental's payment to Monon, the agreement primarily provided Monon an opportunity to subject its trailer to experimental use.

In light of the above testimony, we conclude that Monon has raised a genuine issue of material fact as to whether its December 19, 1983 contract with Continental reflected a "commercial offer for sale." *Pfaff*, 525 U.S. at 67, 119 S.Ct. at 311. Because Monon has raised a genuine issue of material fact as to the first prong of the *Pfaff* test, we need not also examine whether Monon's trailer was "ready for patenting," under the second prong of *Pfaff*.

## II. Inequitable Conduct

 Stoughton alleged that Monon's patent attorney, Andrew Richardson, committed inequitable conduct by intentionally failing to disclose: (1) the sale of the first plate trailer to Continental, (2) U.S. Patent No. 2,620,226 issued to Jones ("Jones"), and (3) Monon's sale to Kaiser Aluminum of a trailer similar to the claimed invention.

 A holding of inequitable conduct requires proof by clear and convincing evidence. This proof must include a threshold showing of both materiality and intent to mislead or deceive the patent examiner. *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 551, 16 USPQ2d 1587, 1592 (Fed.Cir.1990). If the threshold requirements of materiality and intent are established, "those fact findings are balanced to make the determination whether 'the scales tilt to a conclusion that inequitable conduct occurred.'" *Id.* (internal citation omitted). "[T]he more material the omission or the misrepresentation, the lower the level of intent required to establish inequitable conduct, and vice versa." *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1256, 43 USPQ2d 1666, 1668 (Fed.Cir.1997). If, however, either materiality or intent is not found, then no further analysis need be performed and unenforceability must be denied. *Id.*

 Because the adjudication of an inequitable conduct claim is an equitable determination, it is committed to the discretion of the trial court, and will be overturned only if it is shown that the court committed a serious error of judgment, or that the court's determination was based upon clearly erroneous factual findings, or a misapplication or misinterpretation of the applicable law. *Manville*, 917 F.2d at 551, 16 USPQ2d at 1592-93.

The district court ruled on Stoughton's claim of inequitable conduct after conducting a bench trial on the declaratory judgment counterclaim. The patent practitioner who was alleged to have committed inequitable conduct testified, and was

cross-examined before the judge by Stoughton's counsel.

### A. The Continental Sale

As discussed above, Monon sold the first plate trailer to Continental prior to the critical date. Richardson became aware of this sale during the prosecution of the application that issued as the '017 patent, and it is undisputed that he did not disclose it to the Patent and Trademark Office ("PTO"). It is also undisputed that once Richardson learned of the Continental sale, he performed a diligent inquiry to determine the circumstances of the sale. Stoughton argues that once Richardson learned the circumstances of the sale through his inquiry, e.g., that there was no documentary evidence that Continental informed Monon of the trailer's performance during Continental's use, he wrongfully withheld the fact of the sale with the intention of deceiving the PTO in order to secure allowance of the '017 patent claims.

The district court held that while the Continental sale was highly material, Stoughton had failed to prove by clear and convincing evidence that Richardson intended to deceive the PTO, and thus inequitable conduct could not be found. In so doing, the district court considered deposition testimony by Richardson and Ehrlich, correspondence between Richardson and employees of Monon and Continental, and the live testimony of Richardson. Stoughton presented no evidence that conclusively proved deceptive intent; rather, the district court's conclusion that Stoughton had not proven the requisite intent by clear and convincing evidence was based upon its determination of the credibility of the evidence, particularly the testimony of Richardson himself.

### B. The Jones Patent

Jones discloses a trailer having walls with contiguously abutting panels or sheets which are welded together at their joints. Figure 9 of Jones indicates that the panels are contiguously abutting, and one sentence of the written description is directed to the wall structure. However, like the prior art sheet and post trailers, Jones uses thick posts attached to each of the two joined panels along the interior of their welded joint to provide structural support. Stoughton argues that Jones was highly material because it discloses contiguously abutting panels, and therefore would have prevented Richardson's successful traversal of a patentability rejection based upon another prior art patent disclosing a portable housing structure containing contiguously abutting panels. In successfully traversing this rejection, Richardson argued to the examiner that the cited patent was not analogous art and not material because it was "directed to a portable insulated building and not a trailer building."

The district court found Jones to be sufficiently material to support a judgment of inequitable conduct, but that Stoughton had failed to prove the required threshold intent to deceive the examiner.

Stoughton argues that Richardson was aware of the materiality of Jones because prior to arguing traversal of the portable housing patent in the prosecution of the '017 patent, he had responded to a patentability rejection based upon Jones during the prosecution of a copending application directed to an improvement in the plate trailer. Stoughton cites Critikon in arguing that Richardson's prior analysis of Jones allows a high degree of intent to be inferred by the trial court as finder of fact. In Critikon, we affirmed the district court's finding of inequitable conduct because the underlying findings on materiality and intent were supported by the evidence and were not clearly erroneous. 120 F.3d at 1259, 43 USPQ2d at 1671. Here, of course, the trial court found no deceptive intent. Thus, Stoughton in effect ar-

gues that, on this evidence, the finder of fact was *required* to infer deceptive intent. We cannot agree. We hold that the evidence could support either finding on intent. Moreover, the facts in *Critikon* were fundamentally different from those presented here. There was overwhelming evidence in *Critikon* that the patent attorneys clearly understood the materiality of the withheld reference, and were seriously concerned about its effect upon patentability. *Id.* at 1256, 43 USPQ2d at 1669 ("[A]t one point Mr. York reviewed the McDonald patent and in handwritten annotations opined that all the claims, except those including the 'retaining means,' were invalid.").

Stoughton submitted no evidence that Richardson was aware that Jones disclosed contiguously abutting panels, nor that this aspect of Jones was relevant to Richardson's response in the copending application. Indeed, Richardson testified that he understood Jones to teach only elements of plate thickness uniformity related to sheet and post trailers, and that he did not realize, nor did the examiner in the copending prosecution indicate, that Jones disclosed contiguously abutting side panels. Richardson also testified that Jones' disclosure of contiguously abutting side panels was not relevant to the copending prosecution. The district court found Richardson's testimony credible. It found his intent was not deceptive, thus precluding any weighing of the degree of materiality of Jones as well as an ultimate conclusion of inequitable conduct, which require both materiality and deceptive intent.

### C. *The Kaiser Sale*

In 1982, Monon sold Kaiser a customdesigned trailer featuring sidewalls consisting of 0.5″ thick fiberglass reinforced plywood panels sandwiched between thin overlapping sheets of aluminum. Richardson testified that he chose not to disclose this sale to the PTO because he considered

the Kaiser trailer cumulative of other art already before the examiner. The court found that while the Kaiser trailer was closer to the invention claimed in the '017 patent than the prior art sheet-and-post design, there were significant differences. Most importantly, the panels of the Kaiser trailer were joined using splices at abutting joints with overlapping internal and external splice sheets, whereas in the patented structure the sheets are joined by splice plates which are smaller in size and operate differently. Richardson testified that the significant structural differences between the Kaiser trailer and the claimed invention led to his conclusion that the Kaiser trailer was not material.

The district court found that the wall structure of the Kaiser trailer was more similar to the invention claimed in the '017 patent than it was to the prior art sheet and post designs, and therefore met the required threshold of materiality. As to intent, Richardson testified that he did not consider the Kaiser trailer material because it did not contain several elements of the plate trailer that he considered critical, and which were claimed in the '017 patent. The district court found Richardson's testimony credible, and thus found that he lacked deceptive intent.

### D. *The District Court's Findings Regarding Intent*

For each of the three alleged instances of inequitable conduct, the district court found that Stoughton had failed to prove the requisite intent to deceive the PTO. We review the district court's findings of fact for clear error. It is established that "credibility determinations by the trial judge 'can virtually never be clear error.'" *First Interstate Bank of Billings v. United States,* 61 F.3d 876, 882 (Fed.Cir.1995) (quoting *Anderson v. City of Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). In *Anderson,* the Court stated:

> [W]hen a trial judge's finding is based on his decision to credit the testimony of

one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.

470 U.S. at 575, 105 S.Ct. at 1512. While Richardson was apparently the only witness to testify during the bench trial, his testimony was "a coherent and facially plausible story that is not contradicted by extrinsic evidence," and the trial court evidently believed him. Because the court's finding on intent was not inconsistent with extrinsic evidence, we hold that it was not clearly erroneous. *Id.* Thus, we cannot disturb the court's declaratory judgment that inequitable conduct was not proven.

## CONCLUSION

Accordingly, on the appeal, we affirm the denial of Stoughton's counterclaim for a declaratory judgment of unenforceability for inequitable conduct. On the cross-appeal, we reverse the grant of summary judgment of invalidity based on the sample trailer being on-sale or in public use before the critical date. We do so because Monon's evidence on summary judgment raised numerous genuine issues of material fact as to whether the December 19, 1983 contract between Monon and Continental was primarily intended to permit experimental use of the trailer. Although we conclude that Stoughton cannot prevail at the summary judgment stage as to its on-sale bar defense, on remand other matters may be amenable to resolution through summary judgment. If not, the district court should conduct a trial on the merits of the case, including the on-sale bar issue.

*AFFIRMED–IN–PART, REVERSED–IN–PART, AND REMANDED.*

## COSTS

No costs.